# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 10, 2018

Lyle W. Cayce
Clerk

No. 17-40577

UNITED STATES OF AMERICA,

   Plaintiff - Appellee

v.

GALDINO JOSE RUIZ-HERNANDEZ,

   Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, JONES, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Galdino Jose Ruiz-Hernandez helped Patricia Cervantes, a Mexican citizen, enter the United States by first taking a boat across the Rio Grande River and then swimming across a ship channel in Brownsville, Texas. While crossing the ship channel, Cervantes was struck by a passing Coast Guard vessel and killed.

Ruiz-Hernandez was indicted for one count of conspiracy to bring in, transport, and harbor an alien resulting in death and one count of transporting an alien within the United States for private financial gain and resulting in death. He went to trial and was found guilty of both counts. He now appeals, challenging his convictions and the application of two sentencing

No. 17-40577

enhancements under the United States Sentencing Guidelines. Ruiz-Hernandez makes essentially four arguments on appeal: that he did not act in furtherance of Cervantes's unlawful presence in the country; that he did not act for the purpose of financial gain; that Cervantes's death was not reasonably foreseeable; and that his conduct was not the but-for cause of her death. We find those arguments unavailing and affirm.

### I.

### A.

The Brownsville Ship Channel lies just north of the Rio Grande River and connects the Port of Brownsville with the Gulf of Mexico. It is approximately 40 feet deep and 500 feet wide. The channel is a high-traffic waterway, travelled day and night by various vessels from small fishing boats to large tankers. There are no lights along the channel, making it very dark at night, and there is no posted speed limit. The nearby Brownsville Shrimp Basin, however, a shrimp-boat docking area located on the north side of the ship channel, is designated as a "no-wake zone," meaning that vessels must travel slowly to avoid creating a wake that could damage the banks of the basin or cause the small shrimp boats to come untied.

### B.

At 6:15 a.m. on April 24, 2015, Galdino Ruiz-Hernandez approached a security guard in the shrimp basin, telling the guard that someone else had told him that a person had been hit by a boat and needed help. The guard looked for the injured person, but, because it was still dark at the time, was unsuccessful. About an hour later, Police Officer Rolando Doria received a call from a person who (according to the transcript of Doria's testimony) identified himself as "Galdino Jose Luis Hernandez," stating that a woman had been injured by a vessel in the Brownsville Ship Channel. Doria went to the ship channel, where he was flagged down by Ruiz-Hernandez. Ruiz-Hernandez

2

directed Doria to the woman's body, which was floating in the channel. Her body had multiple lacerations and her right foot was severed. She had on her person a Mexican voter-identification card identifying her as Patricia Guadalupe Garcia Cervantes.

Later that same morning, Sergeant Jesus Rosas, an investigator with the Cameron County Sheriff's Office, was dispatched to the scene. Ruiz-Hernandez agreed to provide a voluntary statement, and was taken to the sheriff's office. At the time, he was treated as a witness only and not a suspect. He explained to Sergeant Rosas that, at approximately 3:00 a.m. that morning, he and his "distant cousin Pati [Cervantes]" swam across the ship channel wearing inner tubes. Cervantes had told Ruiz-Hernandez that she could not swim very well, but she was about eight feet ahead of Ruiz-Hernandez when a large ship—later identified as a Coast Guard vessel— approached them "travelling very fast and without any light." The ship squarely struck Cervantes. Ruiz-Hernandez found her two minutes later, floating upside down and unresponsive. He tried, unsuccessfully, to resuscitate her, then went to get help.[1]

After reviewing Ruiz-Hernandez's statement, Sergeant Rosas realized that criminal activity could be involved. Rosas read Ruiz-Hernandez his rights, and Ruiz-Hernandez expanded upon his statement. He explained that he "was only doing a favor [for his] cousin Pati [Cervantes]," who wanted to get away from her abusive husband in Mexico. He said that his other cousin, his co-defendant Gabriel Sanchez, had insisted that he help Cervantes. On April 23, 2015, Sanchez picked Ruiz-Hernandez up from work and drove him to Sanchez's mother-in-law's house in Mexico where Cervantes was staying.

---

[1] At trial, a forensic pathologist testified that Cervantes's death was caused by boat-propeller trauma and drowning. She further testified that Cervantes's injuries were consistent with being struck by the propellers of the Coast Guard vessel.

They stopped along the way to purchase two inner tubes. A ranchero arrived at the house a little while later, who informed Ruiz-Hernandez that he would charge 6,000 pesos to take Ruiz-Hernandez and Cervantes across the Rio Grande. The ranchero then took Ruiz-Hernandez and Cervantes to a ranch near the river, where they waited until approximately 9:30 p.m. before crossing by boat. When they left the boat, Ruiz-Hernandez and Cervantes walked through brush for four or five hours to get to the ship channel. They inflated their inner tubes and began to swim across. Ruiz-Hernandez insisted that he "just wanted to help [his] cousin cross[] the river and that no one offered to pay [him] any money in return."

On April 28, 2015, the Coast Guard contacted Homeland Security Investigations ("HSI") to assist in investigating Cervantes's death. HSI agent Luz Gonzalez then interviewed Ruiz-Hernandez, who provided a similar account to the one he had provided to Sergeant Rosas. Gonzalez also ran a database query for money-service businesses and discovered that there had been a $650 wire transfer from Eleazar Leon Fernandez in New York to Gabriel Sanchez at a Western Union wire-transfer outlet in Brownsville on April 22, 2015. Fernandez explained to Gonzalez that he had paid Sanchez a $650 smuggling fee to bring Cervantes—who was his wife's relative—into the country because she was being abused by her husband. Of that $650, $300 was converted into pesos and given to Ruiz-Hernandez, who then gave it to the ranchero who brought Ruiz-Hernandez and Cervantes across the Rio Grande.

In the course of his investigation, Gonzalez obtained a pink inner tube that had been recovered by the Coast Guard near where Cervantes's body was found. At trial, he testified that the inner tube was not big enough to fit around an adult's waist, and that it appeared to be a floatation device intended for children to use in a swimming pool. He also testified that, during his investigation, he learned that Ruiz-Hernandez was not related to Cervantes.

No. 17-40577

Ruiz-Hernandez was not related to Sanchez either, though they knew each other because they worked together at the nearby Port of Brownsville.

## C.

Ruiz-Hernandez was indicted on one count of conspiracy to bring in, transport, and harbor an alien resulting in death and one count of transporting an alien within the United States for private financial gain and resulting in death.  He went to trial and, after two days of evidence, was found guilty of both counts.  The jury answered three special interrogatories, indicating that they found beyond a reasonable doubt that:  (1) the conspiracy count (Count 1) resulted in the death of a person; (2) the substantive count (Count 2) resulted in the death of a person, and (3) the substantive count (Count 2) was committed for private financial gain.

In calculating Ruiz-Hernandez's Guidelines sentencing range, the pre-sentence report ("PSR") added six points to his base offense level pursuant to § 2L1.1(b)(6) of the Sentencing Guidelines for creating a substantial risk of death or serious bodily harm and another 10 points pursuant to § 2L1.1(b)(7) for a resulting death.[2]  Ruiz-Hernandez objected to the enhancements, but the district court overruled his objections.  The district court did, however, grant Ruiz-Hernandez's motion for a downward departure based on § 5K2.16 for voluntary disclosure of the offense prior to its discovery.  Ruiz-Hernandez was sentenced to 80 months, 17 months below the low end of the applicable Guidelines range.

---

[2] The PSR also added an additional two points under § 3C1.1 for obstruction of justice, which is not at issue in this appeal.

No. 17-40577

## II.

## A.

Ruiz-Hernandez first argues that the evidence was legally insufficient to support his convictions for conspiracy to transport an alien resulting in death (Count One) and transporting an alien for private financial gain and resulting in death (Count Two). Because he did not move at trial for a judgment of acquittal, we review only for whether the convictions constitute a "manifest miscarriage of justice." *United States v. Avants*, 367 F.3d 433, 449 (5th Cir. 2004). "Such a miscarriage 'exist[s] only if the record is "devoid of evidence pointing to guilt," or . . . "because the evidence on a key element of the offense [i]s so tenuous that a conviction would be shocking."'" *United States v. McDowell*, 498 F.3d 308, 312 (alterations in original) (quoting *United States v. Knezek*, 964 F.2d 394, 400 n.14 (5th Cir. 1992)). And as always when we review the sufficiency of the evidence, our review is deferential to the verdict, viewing all evidence "in the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices." *Id.* (quoting *Knezek*, 964 F.2d at 400 n.14). Applying these standards, we conclude that there was no miscarriage here.

## 1.

Ruiz-Hernandez first argues that the evidence is insufficient to support his conviction for the conspiracy charge. To obtain a conviction for conspiracy to transport an alien under 8 U.S.C. § 1324(a)(1)(A), "the government must establish that the defendant[] 'agreed with one or more persons to transport or move illegal aliens within the United States in furtherance of their unlawful presence . . . knowingly or in reckless disregard of the fact that such aliens had come to, entered, or remained in the United States in violation of law." *United*

6

*States v. Chon*, 713 F.3d 812, 818 (5th Cir. 2013) (alteration omitted) (quoting *United States v. Ahmed Khan*, 258 F. App'x 714, 717 (5th Cir. 2007)).

Ruiz-Hernandez argues that the evidence is insufficient to support his conviction because it fails to establish either that he knew that Cervantes's presence in the country was unlawful or that he agreed to act in furtherance of her unlawful presence.  However, there was ample evidence from which a rational jury could infer that Ruiz-Hernandez either knew or acted in reckless disregard of the fact that Cervantes's presence was unlawful.  They entered the country by crossing the Rio Grande, walking for hours across brush, and swimming across a busy ship channel, all in the middle of the night.  A rational jury could conclude that "if [Cervantes] were entitled to enter the United States legally, [s]he would not have utilized this dangerous method of entry." *United States v. Cardenas-Meneses*, 532 F. App'x 505, 512 (5th Cir. 2013).

Furthermore, while Ruiz-Hernandez argues that he acted for the purpose of helping her escape her abusive husband rather than furthering her unlawful presence, § 1324(a)(1)(A) is concerned only with *intent*, not *motive*. "While motive is the inducement to do some act, intent is the mental resolution or determination to do it.  When the intent to do an act that violates the law exists, motive becomes immaterial." *Intent*, Black's Law Dictionary (10th ed. 2014).  Here, there was evidence from which a rational jury could infer that Ruiz-Hernandez agreed to transport Cervantes in furtherance of her unlawful presence.  For example, there is evidence that he knew or should have known that she was not lawfully entitled to enter the country and that he paid a smuggler to bring himself and Cervantes across the Rio Grande and into the country.  Accordingly, we affirm Ruiz-Hernandez's conspiracy conviction.

## 2.

Ruiz-Hernandez also argues that the evidence is insufficient to support his conviction for the substantive transportation charge.  He simply repeats

No. 17-40577

his argument that the evidence was insufficient to establish that he knew or recklessly disregarded the fact that Cervantes's presence in the United States was unlawful.  For the reasons stated above, this argument fails.

**3.**

Next, Ruiz-Hernandez contends that the evidence is insufficient to support the statutory financial-purpose enhancement because there was no evidence that he actually received any of the money transferred to Sanchez. Section 1324(a)(1)(B)(i) of Title 8 increases the maximum penalty for transportation of an alien from 5 years to 10 if "the offense was done for the purpose of commercial advantage or private financial gain."  8 U.S.C. § 1324(a)(1)(B)(i).  Because § 1324(a)(1)(B)(i) increases the applicable statutory maximum sentence, it must be found by a jury beyond a reasonable doubt, *see United States v. McMillon*, 657 F. App'x 326, 338 (5th Cir. 2016) (citing *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000)), and we review the enhancement along with the underlying conviction itself for sufficiency of the evidence, *see United States v. Williams*, 449 F.3d 635, 646 (5th Cir. 2006) ("The 'financial gain' fact is an 'element' of a separate, greater offense."); *see also United States v. Allende-Garcia*, 407 F. App'x 829, 834–35 (5th Cir. 2011) (reviewing proof of financial-purpose element for sufficiency of the evidence).

The financial-purpose element requires the government to prove that the defendant sought "to profit or otherwise secure some economic benefit from [the] smuggling endeavor." *United States v. Garcia*, 883 F.3d 570, 574 (5th Cir. 2018) (construing identical language in 8 U.S.C. § 1324(a)(2)(B)(ii)).  It does not require proof of *actual* payment, only evidence that the smuggling activity was undertaken for the *purpose* of financial gain.  *See id.* at 575; *United States v. Kim*, 435 F.3d 182, 185 (2d Cir. 2006).  Furthermore, a jury is free to infer such a purpose from circumstantial evidence, including evidence that the defendant did not previously know the individuals being smuggled, *see Garcia*,

883 F.3d at 576, and evidence that others in the same smuggling operation had received or would receive money, *see Allende-Garcia*, 407 F. App'x at 833–35. Here, there was such evidence. Ruiz-Hernandez had no prior relationship with Cervantes, and there is evidence that his co-conspirator, Sanchez, received money in exchange for bringing Cervantes into the country. In light of that evidence, there was no miscarriage of justice and we affirm.

**4.**

In Ruiz-Hernandez's final challenge to his convictions, he argues that the evidence was insufficient to support the statutory enhancement for transportation resulting in death. As with the financial-purpose element, the resulting-in-death element, 8 U.S.C. § 1324(a)(1)(B)(iv), increases the applicable statutory maximum sentence and thus must be submitted to the jury and found beyond a reasonable doubt. *See Williams*, 449 F.3d at 645. As an "'element' of a greater aggravated offense," *id.*, we review the resulting-in-death element for sufficiency of the evidence, *see Cardenas-Meneses*, 532 F. App'x at 509–10; *United States v. De Jesus-Ojeda*, 515 F.3d 434, 444–45 (5th Cir. 2008).

Section 1324(a)(1)(B)(iv) increases the applicable statutory maximum sentence to death or life imprisonment in the case of a violation "resulting in the death of any person." 8 U.S.C. § 1324(a)(1)(B)(iv). Ruiz-Hernandez argues that, in order for that enhancement to apply, the government was required to prove that the resulting death was reasonably foreseeable and that the government failed to do so. We have previously declined to decide whether § 1324(a)(1)(B)(iv) requires foreseeability. *See De Jesus-Ojeda*, 515 F.3d at 444–45. Finding here that Cervantes's death was reasonably foreseeable, we again decline to decide whether the government was required to so prove.

Ruiz-Hernandez argues that it was not reasonably foreseeable that a Coast Guard vessel—which he contends was operating in violation of speed

limitations, wake restrictions, and lighting requirements[3]—would strike a person swimming across the ship channel.  The thrust of his argument is that it is unforeseeable that a government vessel, the presence of which is intended to enforce the law and to protect and assist persons present in the channel, would operate in violation of the law and, in so doing, cause harm.  We recognize the tragic irony of the circumstances of Cervantes's death, but, as a legal matter, Ruiz-Hernandez confuses the foreseeability of *harm* with the foreseeability of the *manner* in which harm ultimately occurs.   The foreseeability inquiry turns on whether "harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person." *In re Signal Int'l, LLC*, 579 F.3d 478, 492 (5th Cir. 2009).  "The precise nature of the [resulting] injury and the manner of its infliction is immaterial . . . , so long as the injury is of a type that, in the circumstances, might reasonably have been expected to occur."  *Hall v. Atchison, Topeka & Santa Fe Ry. Co.*, 504 F.2d 380, 385 (5th Cir. 1974).  Here, it was reasonably foreseeable that a person swimming across a high-traffic ship channel in the dark of night would be struck by a passing ship.

That the ship's lights were, we assume, not on at the time of the accident does not change our conclusion.  The negligent acts of others are foreseeable and thus do not break foreseeability.  *See Allied Chem. Corp. v. Hess Tankship Co. of Del.*, 661 F.2d 1044, 1060 (5th Cir. Unit A 1981) ("A subsequent negligent act does not excuse prior negligence except in most unusual circumstances."). A ship travelling at night without lights is not so "extraordinary" that a

---

[3] As summarized above, the evidence at trial showed that there was no speed limit posted in the ship channel and that it, unlike the nearby shrimp basin, is not designated as a no-wake zone.   As to lighting, the evidence presented at trial, derived from Ruiz-Hernandez's statement to Sergeant Rosas, was that the ship was travelling "without any light."  That was later disputed in the PSR.  For purposes of reviewing the sufficiency of the evidence, however, we assume that the ship's lights were not on.

reasonable person would not foresee it, *see Becker v. Tidewater, Inc.*, 586 F.3d 358, 372 (5th Cir. 2009) (explaining that only "highly extraordinary" actions will constitute a superseding cause of harm), and does not render Ruiz-Hernandez's conviction a manifest miscarriage of justice. Accordingly, we affirm Ruiz-Hernandez's conviction under § 1324(a)(1)(B)(iv).

## B.

Ruiz-Hernandez next challenges the district court's application of two sentencing enhancements under the Sentencing Guidelines. The district court increased his base offense level pursuant to § 2L1.1(b)(6) of the Guidelines for creating a substantial risk of death or serious bodily injury and pursuant to § 2L1.1(b)(7)(D) for conduct resulting in death. Because Ruiz-Hernandez objected to the application of these enhancements below, we review "the district court's interpretation and application of the Sentencing Guidelines *de novo*" and its "findings of fact and its application of the Sentencing Guidelines to those findings of fact . . . for clear error." *United States v. Cedillo-Narvaez*, 761 F.3d 397, 401 (5th Cir. 2014). "Sentencing enhancements must be proven 'by a preponderance of the evidence.'" *United States v. Muniz*, 803 F.3d 709, 712 (5th Cir. 2015) (quoting *United States v. Juarez*, 626 F.3d 246, 251 (5th Cir. 2010)). "A factual finding is 'not clearly erroneous as long as it is plausible in light of the record read as a whole.'" *Cedillo-Narvaez*, 761 F.3d at 401 (quoting *United States v. McMillan*, 600 F.3d 434, 457–58 (5th Cir. 2010)).

## 1.

Section 2L1.1(b)(6) provides for an increased base offense level for a defendant convicted of smuggling, transporting, or harboring an alien "if the offense involved intentionally or recklessly creating a substantial risk of death

11

or serious bodily injury to another person." U.S.S.G. § 2L1.1(b)(6).[4]  Ruiz-Hernandez again argues that Cervantes's death must have been reasonably foreseeable in order for § 2L1.1(b)(6) to apply.

Ruiz-Hernandez is correct as a general matter that § 2L1.1(b)(6) requires that a risk of harm be foreseeable. *See De Jesus-Ojeda*, 515 F.3d at 442–43. However, it requires only that *some* risk of death or serious bodily injury be foreseeable, not the specific harm that actually occurred. After all, the enhancement applies for creating a *risk* of harm; no harm at all need actually occur to warrant its application. *See, e.g., United States v. Maldonado-Ochoa*, 844 F.3d 534, 537 (5th Cir. 2016) (affirming application of § 2L1.1(b)(6) where the defendant "started to drive with unrestrained persons lying in the bed of his truck," even though he was pulled over as soon as his vehicle began to move and no one was injured). Accordingly, the relevant inquiry focuses on whether the defendant's conduct "pose[d] inherently dangerous risks to the aliens being transported." *United States v. Solis-Garcia*, 420 F.3d 511, 516 (5th Cir. 2005) (quoting *United States v. Garcia-Guerrero*, 313 F.3d 892, 896 (5th Cir. 2002)). The actual results of the defendant's conduct are irrelevant. *See United States v. Munoz-Tello*, 531 F.3d 1174, 1185 (10th Cir. 2008) ("In assessing whether the enhancement was appropriate, we must focus exclusively on the defendant's *conduct*, ignoring the *results* of that conduct."). As discussed above, it was reasonably foreseeable that a person swimming across a busy ship channel in the dark of night would be struck by a passing ship. Accordingly, we affirm the district court's application of the sentencing enhancement under § 2L1.1(b)(6).

---

[4] Section 2L1.1(b)(6) instructs courts to increase a base offense level "by 2 levels, but if the resulting offense level is less than level 18, increase to level 18." U.S.S.G. § 2L1.1(b)(6). Here, because Ruiz-Hernandez's base offense level before application of this enhancement was 12, its application resulted in a six point increase to level 18.

No. 17-40577

**2.**

Section 2L1.1(b)(7) provides for a ten-point increase in the base offense level "[i]f any person died" in the course of the smuggling or transportation offense.    U.S.S.G.  §  2L1.1(b)(7).    Ruiz-Hernandez  acknowledges  that § 2L1.1(b)(7) requires only that a defendant's conduct be the but-for, not proximate, cause of the resulting death. *See United States v. Ramos-Delgado*, 763 F.3d 398, 401–02 (5th Cir. 2014).   However, he contends the evidence shows that the Coast Guard vessel, and not his conduct, was the but-for cause of Cervantes's death.  We disagree.

But-for causation exists if the result would not have occurred without the conduct at issue. *See Burrage v. United States*, 134 S. Ct. 881, 888 (2014). A particular result can be caused by multiple necessary factors—multiple but-for causes—yet one of those single factors will still be considered a but-for cause so long as the result would not have occurred in its absence. *Id.* Here, while the Coast Guard ship was *a* but-for cause of Cervantes's death, she would not have been in its path but for Ruiz-Hernandez's conduct in smuggling her across the ship channel.  Accordingly, his conduct was also a but-for cause of her death, and the district court did not err in applying the enhancement under § 2L1.1(b)(7).

**III.**

For the foregoing reasons, we AFFIRM Ruiz-Hernandez's convictions and his sentence.

13